**Opinion issued November 2, 2017**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00292-CV

————————————

**WILLIAM J. GONYEA, JR., Appellant**

**V.**

**ORIAN SCOTT, Appellee**

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-51066**

---

# O P I N I O N

This case tests the bounds of the rule established in *Peeler v. Hughes &*
*Luce*, 909 S.W.2d 494 (Tex. 1995) (plurality opinion), which limits the ability of

plaintiffs who have been convicted of criminal offenses to obtain legal malpractice

damages against their criminal-defense attorneys based on claims of poor performance of legal representation.

Orion Scott—who had been convicted of several criminal offenses—hired attorney William Gonyea to file an application for writ of habeas corpus on his behalf. Under the terms of the contract for legal representation, Scott paid Gonyea a $25,000 fee and then, due to confusion over bank authorizations, paid him $15,000 more in overpayments.[1] Scott instructed Gonyea to return the $15,000 overpayment; he did not.

When three years had passed and Gonyea had neither filed the writ nor returned the overpayment, Scott sued him, asserting two causes of action. His first cause of action was for breach of contract. He sought $25,000 in restitution damages, which was the full amount of the fee paid under the terms of the contract. His second cause of action was for theft and sought $15,000 in damages, which was the amount of overpayment that Gonyea never returned.

After answering the lawsuit, Gonyea moved for summary judgment, arguing that both of Scott's claims fail as a matter of law. The trial court ruled against him and, after a bench trial, entered judgment in Scott's favor on both claims for the damages sought, plus reasonable and necessary attorney's fees. Gonyea appeals, asserting that both claims fail as a matter of law.

---

[1] Originally, the overpayment was $25,000, but $10,000 of that was applied to additional representation, leaving the amount of overpayment at $15,000.

2

We affirm the judgment as to the breach-of-contract claim, holding that the public policies underlying the *Peeler* doctrine do not support extending the doctrine to restitution of monies paid for post-conviction legal services that were never performed. We reverse and render judgment in Gonyea's favor on the theft claim, holding that the claim accrued more than two years before it was asserted and that Scott failed to meet his burden to prove that the discovery rule applied.

**Background**

In January 2010, Orion Scott hired a criminal-defense attorney, William Gonyea, Jr., to conduct a legal investigation and file a petition for writ of habeas corpus on Scott's behalf to challenge six convictions that the Texas Court of Criminal Appeals had affirmed three years earlier. Gonyea and Scott entered into a written contract for legal representation, and Scott paid Gonyea $25,000 in legal fees for the work detailed in the contract. Gonyea deposited the $25,000 into his operating account.

Due to confusion over whether the bank would authorize a payment from an inmate, Scott's sister—who held Scott's power of attorney—caused a second payment of $25,000 to be paid to Gonyea for the habeas representation. Gonyea wrote to Scott in March 2010 informing him that he had received two $25,000 payments and stating, "I will wait for you to advise me on what to do with the [second] $25,000 check."

Later that month, Gonyea agreed to assist Scott on another legal matter. He wrote to Scott that he agreed to "conduct an investigation to determine the status of [Scott's] parole and assist [Scott] in obtaining parole" and that his fee for the additional representation would be $10,000. In the same letter, Gonyea stated that he still had Scott's sister's check for $25,000 (the overpayment for the habeas representation) and offered to deposit the check into his "client trust account" and then return the remaining $15,000 to Scott, either by sending Scott a check or depositing the money directly into Scott's bank account.

After several communications, in late-August 2010, Scott instructed Gonyea to "deduct" the $10,000 parole-work fee from the overpayment and deposit the remainder into Scott's bank account. Scott provided Gonyea with his bank information, including his account number.

Nevertheless, within days of receiving Scott's letter, Gonyea deposited the full $25,000 he received from Scott's sister into his operating account—not his trust account.[2] He did not deposit any money into Scott's account or send him a refund check for the overpayment.

---

[2] None of the $50,000 was deposited into a client trust account. All of it was deposited into Gonyea's operating account.

Three years later, Gonyea still had not prepared the habeas writ or returned the $15,000 overpayment.[3] Scott replaced Gonyea with new counsel and filed suit against him, asserting claims for breach of contract to recover the $25,000 fee payment and for theft to recover the $15,000 overpayment.

Gonyea moved for summary judgment on both of Scott's claims, arguing that the *Peeler* doctrine prohibited Scott's breach-of-contract claim and that the theft statute of limitations barred Scott's theft claim. *See Peeler*, 909 S.W.2d 494; *see also* TEX. CIV. PRAC. & REM. CODE § 134.001–.005 (theft statute); *id.* § 16.003(a) (two-year statute of limitations for theft claims). The trial court denied the motion, and both claims proceeded to bench trial.

During opening statement, Gonyea again urged that the *Peeler* doctrine applied to Scott's breach-of-contract claim, which he described as Scott "essentially" contending that he was "not happy with the way the lawyer performed under the contract." According to Gonyea, Scott was "claiming that he was dissatisfied with the time that it took and the manner in which [Gonyea] conducted the Habeas investigation and the time that it took for [Gonyea] to file a Habeas Petition." And, further, that Scott simply was "dissatisfied with the amount of correspondence that he received during the course of the representation."

---

[3] Gonyea testified that his failure to return the $15,000 was the result of an "accounting error," which he discovered after Scott sued him. Even after discovering the error, Gonyea failed to return the money.

5

During his opening statement, Scott disputed Gonyea's characterization of his claim. His complaint was not that Gonyea performed poorly, but that he failed to perform at all. The contract specifically stated that Gonyea would conduct an investigation, file an application for writ of habeas corpus, and represent Scott in court. Scott argued that Gonyea did none of these things.

Gonyea testified that he was Scott's counsel for three years before being replaced with new counsel. He agreed that Scott retained him to investigate an application for a habeas writ and then prepare and file the application. Gonyea testified that he met with Scott once, read the legal opinion affirming Scott's conviction, and performed initial legal research. When questioned about his legal research, Gonyea conceded he had no contemporaneous time records showing that he researched the case. But he did reference legal-research memoranda that were in his client file when he forwarded it to Scott's new counsel. When questioned about those memos, Gonyea testified that he could not specifically recall much about them.

On further cross-examination, Gonyea admitted that, during the three years he represented Scott, he never interviewed Scott's trial counsel, never interviewed Scott's appellate counsel, never attempted to contact the police officers who investigated or testified about the underlying offenses, never interviewed any witness who testified at the criminal prosecution, never prepared any drafts of an

6

application for habeas relief, and never even identified what issues should be pursued. He also never filed an application for the habeas writ, never requested an evidentiary hearing, and never represented Scott in court. Gonyea also acknowledged that he had promised to send Scott a comprehensive status update over a year after he was hired, but he never did that either.

After the one-day trial, Scott moved to reopen the evidence. The trial court granted the motion and received additional evidence regarding the legal-research memoranda discussed previously. The four research memos were admitted into evidence. All of the memos had headers stating that they were prepared by a law clerk for Gonyea for the Scott file. One of the law-clerk authors testified that he did not prepare any legal-research memos for Gonyea or for the Scott file. He recognized the memos in evidence and testified that he had prepared them for another law firm.

Gonyea testified that, for a time, he had shared office space with the other law firm. He conceded that the four legal memoranda were addressed to him and referenced the Scott client file only because he had accessed the other law firm's computer server, replaced the other law firm attorney's name and client name in the header of the memos with his name and Scott's client name, printed the memos, and added them to the Scott client file before forwarding that file to

Scott's new attorney.[4] Gonyea denied that he did this to create the appearance that legal work had been performed on Scott's behalf during his representation when it had not.

The lawyer with whom Gonyea shared office space also testified. He testified that he did not give Gonyea permission to use the memos as his own. Nor did he give Gonyea permission to present his firm's legal work as Gonyea's own:

> I did not give you permission to go into my server and pull documents off of other cases, whether to use for your own purposes or to pad a file to make it look like you did work you didn't do to justify a fee you didn't earn. I didn't give you that permission, you didn't ask. And if you had access to those documents and took them without my permission, shame on you.

The trial court entered findings of fact and conclusions of law, including that Scott paid Gonyea $25,000 in legal fees under a contract for legal representation; Scott hired Gonyea to investigate and file a writ of habeas corpus on Scott's behalf; Gonyea "did not conduct the investigation," "did not file a writ of habeas corpus," and "did not perform the services promised in the written contract"; Scott's family inadvertently paid Gonyea $25,000 more for that same work; Scott and Gonyea agreed that $10,000 of the $25,000 double-payment would be applied

---

[4] Gonyea agreed that Scott's new counsel requested the client file in December 2012 but that he did not send it to her with these memos inside until March 2013. Gonyea further agreed that it was not until January 2015—after he had been sued for breach of contract and theft—that he forwarded to Scott's new counsel a few pages of handwritten notes that discussed Scott's case and listed a few case citations.

toward additional representation; and Gonyea did not return the remaining $15,000 of the overpayment. The trial court found that Gonyea breached the contract for legal representation and violated the Texas Theft Liability Act, and the court awarded Scott the full $25,000 fee for legal representation, $15,000 in theft damages, and $76,800 in reasonable and necessary attorney's fees.

Gonyea appealed.

## Standards of Review

Gonyea sought summary judgment on his affirmative defenses of the *Peeler* doctrine and statute of limitations. The applicability of the *Peeler* doctrine to negate causation presents a question of law that we review de novo. *See In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994) (stating that "questions of law are always subject to de novo review").

A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense. *KPMG Peat Marwick v. Harrison Cty. Housing Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). The defendant must conclusively prove when the cause of action accrued and negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence, should have discovered the nature of its injury. *Id.*

Findings of fact in a bench trial have the same force and dignity as a jury's verdict. *Leax v. Leax,* 305 S.W.3d 22, 28 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). "When the appellate record includes the reporter's record, the trial court's factual findings, whether express or implied, are not conclusive and may be challenged for legal and factual sufficiency of the evidence supporting them." *Hertz Equip. Rental Corp. v. Barousse*, 365 S.W.3d 46, 53 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). We review the trial court's findings of fact for legal and factual sufficiency using the same standards we apply in reviewing the evidentiary sufficiency of the jury findings. *Vannerson v. Vannerson,* 857 S.W.2d 659, 667 (Tex. App.—Houston [1st Dist.] 1993, writ denied). We review a trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex. 2002).

When the trial court acts as factfinder, it determines the credibility of the witnesses and the weight to be given their testimony. *HTS Servs., Inc. v. Hallwood Realty Ptrs., L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

### *Peeler* Doctrine

In his first issue, Gonyea argues that Scott's breach-of-contract claim fails as a matter of law under the *Peeler* doctrine.

## A. *Peeler* and its progeny

Public policy requires that a person convicted of a criminal offense not be permitted to profit from his criminal conduct by obtaining a money damages award against his criminal-defense lawyer for legal malpractice that allegedly contributed to the client's incarceration. *Peeler*, 909 S.W.2d at 498. This is achieved through a rule of law—the *Peeler* doctrine—that provides that the sole proximate and producing cause of the indictment and conviction on a criminal defendant is, as a matter of law, the individual's own criminal conduct, unless the criminal defendant has been exonerated on direct appeal, through post-conviction relief, or otherwise.[5] *Id.* at 497–98; *see Douglas v. Delp*, 987 S.W.2d 879, 884 n.1 (Tex. 1999) (citing *Peeler* for statement of law that "plaintiffs convicted of a crime may maintain legal malpractice claims in connection with that conviction 'only if they have been exonerated on direct appeal, through post-conviction relief, or otherwise.'").

---

[5] The plaintiff in *Peeler* sued her attorney for failing to inform her, before she pleaded guilty to a crime, that the prosecutors had offered her full transactional immunity. *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex. 1995). She asserted several causes of action but, on appeal, the issues were narrowed to two: legal malpractice and DTPA violations. Her attorney moved for summary judgment, arguing that Peeler's own criminal conduct was the sole proximate or producing cause of her damages. *Id.* The trial court granted the motion, the intermediate appellate court affirmed, and the Texas Supreme Court again affirmed. *Id.* at 500. The Court explicitly stated that it resolved the issue based on public-policy considerations. *Id.* at 495, 497, 498, 500. Its ruling that her criminal conduct was the sole cause of her injury as a matter of law prevented Peeler, who had not been exonerated, from establishing causation on her negligence and DTPA actions against her former attorney. *Id.* at 498.

There are four public policies furthered by this rule, according to the Court in *Peeler*:

- prohibiting a convict from profiting financially from illegal conduct;

- preventing a convict from obtaining a monetary recovery that would impermissibly shift responsibility for the crime away from the convict to a third party;

- preventing the diminishment of consequences of criminal conduct for the convict; and

- preventing the pursuit of legal remedies that would undermine the criminal justice system.

*Id.* at 497–98. The Texas Supreme Court balanced these public policies against the interest in "holding defense attorneys responsible for their professional negligence" and held that, on balance, public policy supported the rule announced. *Id.* at 500.

Since *Peeler*, the doctrine has been applied in numerous legal malpractice suits. *See, e.g.*, *McLendon v. Detoto*, No. 14-06-00658-CV, 2007 WL 1892312, at *1 (Tex. App.—Houston [14th Dist.] July 3, 2007, pet. denied) (mem. op.) (applying *Peeler* to claims for negligent performance of legal services); *Golden v. McNeal*, 78 S.W.3d 488, 494 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (same); *Larson v. Hunt*, No. 01-00-01196-CV, 2002 WL 992410, at *3 (Tex. App.—Houston [1st Dist.] May 16, 2002, no pet.) (not designated for publication) (same); *Johnson v. Odom*, 949 S.W.2d 392, 394 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (same).

12

The Texas Supreme Court has not expanded the rule beyond the malpractice context. *See Futch v. Baker Botts, LLP*, 435 S.W.3d 383, 391 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting lack of subsequent analysis of doctrine by Texas Supreme Court in nearly 20 years since *Peeler* decision). But intermediate appellate courts have.

The Fourteenth Court of Appeals is the intermediate appellate court that has written most extensively on *Peeler* and has noted its own history of "expansive interpretation" of the doctrine. *See Futch*, 435 S.W.3d at 391. It has expanded *Peeler* to claims of poor-quality legal representation cast as causes of action other than legal malpractice.[6] *Id.* (discussing expansion); *see, e.g.*, *id.* at 392 (applying *Peeler* to claim for fee forfeiture based on inadequate representation); *Wooley v. Schaffer*, 447 S.W.3d 71, 74, 76–78 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (applying *Peeler* to claims of legal malpractice, breach of contract, and DTPA violations based on attorney filing application for writ of habeas corpus that included arguments different than those client believed to be most meritorious); *Meullion v. Gladden*, No. 14-10-01143-CV, 2011 WL 5926676, at *4–5 (Tex.

---

[6] The Fourteenth Court of Appeals has also extended *Peeler* to apply to assertions of poor-quality legal representation at the pre- and post-trial stages of representation. *See McLendon v. Detoto*, No. 14-06-00658-CV, 2007 WL 1892312, at *1–2 (Tex. App.–Houston [14th Dist.] July 3, 2007, pet. denied) (mem. op.) (pre-trial representation); *Meullion v. Gladden*, No. 14-10-01143-CV, 2011 WL 5926676, at *3–4 (Tex. App.–Houston [14th Dist.] Nov. 29, 2011, no pet.) (mem. op.) (post-conviction representation).

13

App.—Houston [14th Dist.] 2011, no pet.) (mem. op.) (applying *Peeler* to claims of fraud, breach of fiduciary duty, breach of contract, and DTPA violations based on "the quality of legal counsel" after concluding that all were, in effect, claims of professional negligence concerning the application for writ of habeas corpus filed by attorney on client's behalf);

This Court has expanded *Peeler* similarly, applying it to claims of poor-quality legal representation cast as other causes of action. *See Stallworth v. Ayers*, 510 S.W.3d 187, 191 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (holding that client complaining about quality of representation is in essence asserting legal malpractice claim to which *Peeler* applies, even if claims are cast as other causes of action); *Van Polen v. Wisch*, 23 S.W.3d 510, 515 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (applying *Peeler* to breach-of-contract claim based on attorney's representation through portion of proceeding but not all of it).

Thus, *Peeler* and its progeny prohibit a criminal defendant who is asserting claims based on poor-quality legal representation from establishing the causation necessary to recover money damages from his attorney. *Peeler*, 909 S.W.2d at 497–98; *Futch,* 435 S.W.3d at 391.

**B.    The parties' arguments on whether *Peeler* applies**

Gonyea argues that the *Peeler* doctrine applies here because Scott's breach-of-contract claim is "based upon his assertion that [Gonyea] failed to adequately

14

represent him and discharge his legal duties." In other words, he argues that the breach-of-contract claim is merely a recast legal malpractice claim that *Peeler* prohibits.

Scott responds that his complaint is not that the legal services he received fell below a subjective or objective standard of care or contributed to his conviction, but that, instead, he received *no* representation. He argues that Gonyea did nothing in furtherance of his habeas writ. And he argues that public policy cannot support foreclosing a client's suit against his attorney who entered into a contract for legal representation, accepted a fee to perform specific legal work, and then did nothing that advanced the legal representation.

## C. Sufficient evidence supports finding that Gonyea "did not perform the services promised in the written contract"

Gonyea argues that this case does not concern an attorney who performed no work for his client. According to Gonyea, after being paid a flat fee, he engaged in the initial case-familiarity steps common to habeas representation: he interviewed his client once, read the underlying opinion affirming conviction and briefs, and performed some initial legal research. But there was no corroborating evidence that Gonyea interviewed Scott or read any case materials. And Scott presented evidence calling into question the veracity of Gonyea's testimony that he had done any of this work. Gonyea ultimately admitted that the legal research memos he forwarded to replacement counsel as part of his client file had been altered—by

15

him—in a manner that suggested they were prepared at his instruction and for Scott's benefit when they were already-written research memos prepared for another law firm representing another client.

In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses; therefore, it was within the trial court's sole province to evaluate conflicting evidence and make credibility determinations. *See HTS Servs., Inc.*, 190 S.W.3d at 111; *Olanipekun v. Omokaro*, No. 01-13-00888-CV, 2014 WL 5410058, *4 (Tex. App.—Houston [1st Dist.] Oct. 23, 2014, no pet.). The only evidence suggesting that Gonyea performed any legal work in furtherance of his representation of Scott—during his representation of Scott—was Gonyea's testimony. The revelation that Gonyea altered legal research memos in his client file in a way that would buttress his assertion that he added value to Scott's case was directly relevant to Gonyea's credibility as a witness. His inability to provide time records to support his contention that he performed legal research during the representation[7] or otherwise developed the case further affected his credibility.

---

[7] Gonyea's handwritten notes were not produced until January 2015, after Gonyea had been sued for breach of contract and theft. The only evidence that the notes were prepared during the representation was Gonyea's testimony.

The evidence is sufficient to support the trial court's finding that Gonyea "did not conduct the investigation," "did not file a writ of habeas corpus," and "did not perform the services promised in the written contract."

**D.** *Peeler* **does not extend to these facts**

The trial court found that Gonyea did not perform any services specified in the contract for legal representation. Instead, there was affirmative evidence indicating that Gonyea falsified memos in a manner to suggest legal analysis had been performed for Scott's benefit when it had not. The trial court's findings and trial evidence distinguish this case from earlier cases in which the *Peeler* doctrine was applied to disallow damages claims by convicts against their defense counsel.

Gonyea argues that the Dallas Court of Appeals applied *Peeler* even when an attorney has done nothing, citing *Shepherd v. Mitchell*, No. 05-14-01235-CV, 2016 WL 2753914 (Tex. App.—Dallas May 10, 2016, no pet.) (mem. op.), but that case did not involve claims for restitution. There, an attorney was hired to prepare an application for writ of habeas corpus. He neither prepared the application nor returned the fee. But the client received a refund of the fee as a result of a restitution order from the State Bar of Texas. *Id.* at *1. He also had sued the attorney for legal malpractice. *Id.* The attorney moved for summary judgment on the *Peeler* doctrine, and the trial court granted the motion. The appellate court affirmed, holding that the doctrine applied to the legal malpractice claim. *Id.* at *3.

*Shepherd* is distinguishable. First, the client's suit was for professional negligence, not breach of contract. Second, the client was not suing for contract damages or fee recovery: he had already received restitution. *Id.* Here, Scott is suing for breach of contract and seeking recovery of the legal fees he paid Gonyea for services never performed.

None of the public policies identified in *Peeler* support extending the doctrine to foreclose a paying client's ability to sue for recovery of restitution damages when he contracts with a criminal-defense attorney to perform specific work and the attorney fails to provide that representation. Such a suit would not result in financial profit to the client. It would not shift responsibility for the crime away from the client or diminish the consequences of the client's acts. Nor would it undermine our criminal-justice system. If anything, requiring some evidence of active representation to invoke *Peeler* defensively recognizes that the constitutional right to assistance of counsel is foundational to our criminal-justice system. *See* U.S. CONST. amend. VI (right to counsel); *cf. Strickland v. Washington*, 466 U.S. 668, 685 (1984) ("The Sixth Amendment . . . envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney . . . who plays the role necessary to ensure that the trial is fair.").

18

Permitting a criminal-defense attorney to charge a criminal defendant a legal fee to provide contractually detailed legal representation, do none of those acts of representation or any other underlying act that involves applying legal analysis to the client's case, yet keep the fee does not further the public policies identified in *Peeler*. To hold otherwise might create a disincentive to diligent representation of criminal defendants. We conclude that the *Peeler* doctrine does not extend to these facts.

We overrule Gonyea's first issue.

### Statute of Limitations on Theft Claim

In his second issue, Gonyea contends that the statute of limitations ran on Scott's theft claim and that Scott could not invoke the discovery rule because he presented no evidence to support applying it.

We first review the timeline of events:

| | |
|---|---|
| February 5, 2010 | Scott notes in a letter that his sister will send payment on his behalf |
| March 8, 2010 | Gonyea deposits Scott's check into his operating account |
| March 10–12, 2010 | Scott states in letter to Gonyea that he confirmed that his bank did send fee from his checking account, even though no one thought the bank would follow his instructions. Gonyea states in letter that he received the fee payment from Scott *and* a second fee payment from Scott's sister and asks Scott what to do with second check from sister |

| | |
|---|---|
| March 26, 2010 | Gonyea writes to Scott offering to deposit $25,000 check from sister into "client trust account" and send from that account a check for $15,000 to Scott or deposit that amount directly into Scott's account |
| August 24, 2010 | Gonyea asks Scott again whether to deposit the $25,000 check from sister into trust account and refund difference |
| Late-August 2010 | Scott replies to Gonyea (on Gonyea's August 24 letter) with instructions for Gonyea to deduct his $10,000 parole-related fee from the sister's double-payment and return the $15,000 balance |
| August 30, 2010 | Gonyea deposits the $25,000 check from the sister into his operating account |
| | *— two and one-half years pass—* |
| January 16, 2013 | Scott terminates the representation |
| August 28, 2014 | Scott's new counsel sends Gonyea a letter requesting an accounting; Gonyea does not respond |
| September 8, 2014 | Scott files suit against Gonyea |
| October 21, 2014 | Scott adds theft claim to petition |

The Texas Theft Liability Act permits a civil claim for damages against a party who commits theft, which is "unlawfully appropriating property or unlawfully obtaining services" in violation of various named sections of Chapter 31 of the Penal Code. *See* TEX. CIV. PRAC. & REM. CODE § 134.001–.005; *Cluck v. Mecom*, 401 S.W.3d 110, 117 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). A two-year statute of limitations applies. *See* TEX. CIV. PRAC. & REM. CODE § 16.003(a). The defendant has the burden to plead, prove, and secure

20

findings to sustain the limitations affirmative defense. *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988); *see also* TEX. R. CIV. P. 94 (statute of limitations is affirmative defense). In response, a plaintiff may raise the discovery rule and, if it applies to the claim asserted, may seek to have his failure to file suit within the normal limitations period excused. *Woods*, 769 S.W.2d at 517. A plaintiff seeking to benefit from the discovery rule bears the burden to plead, prove, and secure favorable findings to establish the excuse. *See id.* at 518.

Gonyea pleaded statute of limitations on Scott's theft claim. Scott pleaded the discovery rule.

The trial evidence included Gonyea's testimony that he realized, upon receipt, that the second check for $25,000 was an erroneous overpayment. He reached an agreement with Scott to perform additional work for a $10,000 flat fee and was aware that the remaining $15,000 belonged to Scott and should be returned. He testified that his intent was to deposit the entire $25,000 of the second check into a trust account and, from that account, return $15,000 to Scott. As he explained,

> The reason why I—at that time—thought it would be proper to deposit into my trust account is because the additional $15,000 did not belong to me. And, so, I didn't think it would be proper to deposit the entire thing into my operating account where there were funds that didn't belong to me. So, I would have deposited the entire $25,000 into my trust account, deducted my fee and then sent it him back.

21

The information Gonyea conveyed to Scott at the time was that the full amount of the check would be deposited into Gonyea's trust account and $15,000 would be forwarded to him from the trust account. Gonyea wrote to Scott, "I still have the check for $25,000, if you would like to hire me [for the additional representation at $10,000], I can deposit it in my client trust account and send a check to you, or your bank for deposit into your account, for $15,000." Scott responded with a letter in late-August 2010 with instructions for Gonyea to deduct his fee and deposit the balance into Scott's bank account. There is no evidence that Scott ever followed up with Gonyea regarding his August 2010 request for Gonyea to return the money.

Rule 1.14 of the Disciplinary Rules of Professional Conduct require an attorney to "hold funds and other property belonging in whole or in part to clients or third persons that are in a lawyer's possession in connection with a representation separate from the lawyer's own property." TEX. DISCIPLINARY R. PROF. CONDUCT 1.14(a), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G, app. A–1. The lawyer must maintain such funds "in a separate account, designated as a 'trust' or 'escrow' account . . . ." *Id.* Despite Gonyea's representation in the letter that the $25,000 would be deposited into his trust account, Gonyea deposited the money into his operating account on August 30, 2010.

The August 30, 2010 date of deposit marked the date that the theft claim accrued. *See Agar Corp. v. Electro Circuits Int'l, LLC*, No. 14-15-00134-CV, 2016 WL 7436811, at *5 (Tex. App.—Houston [14th Dist.] Dec. 22, 2016, no pet. h.) ("A claim generally accrues when a wrongful act causes injury."). Scott did not assert his theft cause of action within two years of that date. Accordingly, the claim expired unless the discovery rule applies. *See Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996) ("The discovery rule exception defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action.").

The discovery rule provides a "very limited exception to statutes of limitations." *Id.* Generally, the rule has been applied in cases in which "the nature of the injury incurred is inherently undiscoverable" and "the evidence of injury is objectively verifiable." *Id.* at 456. This limits application to circumstances in which "it is difficult for the injured party to learn of the negligent act or omission." *Id.* (quoting *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)).

Scott argues that the discovery rule applies. According to Scott, Gonyea's letter stated that the double-payment would be placed into a trust account, and Scott could not have known that Gonyea actually placed the money in an unauthorized operating account. Scott argues that the discovery rule should prevent the claim from expiring until Scott discovered that the funds were wrongly

23

deposited into Gonyea's operating account instead of a trust account, where they should have been deposited for his benefit under the rules governing attorneys. *See* TEX. DISCIPLINARY R. PROF. CONDUCT 1.14(a); *cf. Cluck v. Comm'n for Lawyer Discipline*, 214 S.W.3d 736, 739–40 (Tex. App.—Austin 2007, no pet.) (holding that attorney violated Rule 1.14 by depositing legal fee in operating account instead of trust account because payment was prepayment for services to be rendered, not retainer to secure lawyer's availability and compensate for lost opportunities and, thus, had to be held in separate trust account).

Even assuming the discovery rule applies, Scott did not meet his burden to establish that he did not or could not have discovered that Gonyea failed to return his money. *See Computer Assocs. Int'l*, 918 S.W.2d at 455 ("The discovery rule exception defers accrual . . . until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action."). First, Scott instructed Gonyea to return $15,000 to him more than two years before he filed suit for theft of the money. Second, Scott did not testify at trial; therefore, he offered no evidence concerning what he knew about the handling of the fee and when he knew it. Third, the evidence establishes that Scott was able to communicate effectively from jail with his bank to have the initial $25,000 fee paid to Gonyea. Scott thus could communicate with his bank to stay informed of the status of his account to determine whether the refund was received. Without

any testimony from Scott explaining why he was unable to determine that the money had not been returned as he instructed, we conclude that Scott failed to meet his burden to avail himself of the discovery rule. *See Woods*, 769 S.W.2d at 518 ("The party seeking to benefit from the discovery rule must also bear the burden of proving and securing favorable findings thereon . . . [because that party] will generally have greater access to the facts necessary to establish that it falls within the rule.").

We sustain Gonyea's second issue.

## Conclusion

We affirm the portion of the judgment awarding Scott damages on the breach-of-contract claim, reverse the portion of the judgment finding Gonyea liable for theft damages, render judgment in Gonyea's favor on the theft claim, and affirm the remainder of the judgment.

Harvey Brown
Justice

Panel consists of Justices Jennings, Bland, and Brown.

25